IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DEBORAH K. ALFORD : | CIVIL ACTION |
| : | |
| v. : | No.: 07-4527 |
| : | |
| HARTFORD LIFE INSURANCE COMPANY : | |
| : | |

**MEMORANDUM AND ORDER**

**Juan R. Sánchez, J.**                                                                                       **June 3, 2008**

Plaintiff Deborah K. Alford asks this Court for Declaratory Judgment against Hartford Life Insurance Company for violating the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1001-1461, by denying her long-term disability benefits. Hartford Life Insurance Company argues the record supports its denial and I should affirm. Under a moderately heightened arbitrary and capricious standard of review, I conclude the record supports Hartford's denial of Alford's long-term disability benefits.

**FACTS**

Alford has worked at Hartford Steam Boiler and Insurance Company (HSB)[1] since October 1990. Under the Group Insurance Policy, Hartford is the claims fiduciary and grants Hartford full discretion and authority to determine eligibility for benefits and interpret all terms of the plan. R. at 1- 53. Hartford administers and insures the plan.

In 1990, Alford began working in customer service and underwriting and was promoted to a team leader in January 1997. Around July 2003, Alford was diagnosed with Hashimoto's

---

[1] HSB is a part of HSB Group, Inc., a wholly owned subsidiary of American International Group, Inc. (AIG). Hartford issued a group insurance policy to AIG which was in effect on January 1, 2005.

thyroiditis;[2] she suffered pain, fatigue, weight gain, temperature intolerance, skin rashes, improper sleep, throat pain as well as other small illnesses.

In March 2004, Dr. Eswar Krishnan, rheumatologist, treated and examined Alford. After examining her, Dr. Krishnan diagnosed Alford with fibromyalgia,[3] but found "her joints had excellent [Range of Movement]." R. at 181-83 (Letter from Dr. Krishnan to Dr. Hayes, Alford's primary physician, (Apr. 13, 2004) regarding his examination of Alford). Alford sought treatment for both diseases, but her health continued to deteriorate. She remained a team leader until March 2004 when she accepted a demotion to a customer service position, which requires Alford to predominantly sit, occasionally stand or walk, and mostly conduct data entry.[4]

---

[2] Hashimoto's thyroiditis is defined as "inflammation of the thyroid gland or diffuse infiltration of the thyroid gland with lymphocytes, resulting in diffuse goiter, progressive destruction of the parenchyma and hypothyroidism." *King v. Astrue* 2008 WL 648514, at * 2 n.4 (E.D. Mo. March 5, 2008) (citing PDR. Med. Dict. at 1834). It is also is synonymous with autoimmune thyroiditis. *Id*.

[3] The Third Circuit has recognized fibromyalgia as "a common, but elusive and mysterious, disease, much like chronic fatigue syndrome, with which it shares a number of features." *Post v. Hartford Ins. Co.,* 501 F.3d 154, 159 n. 2 (3d Cir. 2007) (citing Frederick Wolfe et al., *The American College of Rheumatology 1990 Criteria for the Classification of Fibromyalgia: Report of the Multicenter Criteria Committee*, 33 Arthritis & Rheumatism 160 (1990); Lawrence M. Tierney, Jr., Stephen J. McPhee & Maxine A. Papadakis, Current Medical Diagnosis & Treatment 1995 708-09 (1995)). The Court further commented:

> Its cause or causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective. There are no laboratory tests for the presence or severity of fibromyalgia. The principal symptoms are "pain all over," fatigue, disturbed sleep, stiffness, and-the only symptom that discriminates between it and other diseases of a rheumatic character-multiple tender spots, more precisely 18 fixed locations on the body (and the rule of thumb is that the patient must have at least 11 of them to be diagnosed as having fibromyalgia) that when pressed firmly cause the patient to flinch. All these symptoms are easy to fake, although few applicants for disability benefits may yet be aware of the specific locations that if palpated will cause the patient who really has fibromyalgia to flinch.

*Id.* (citing *Sarchet v. Chater*, 78 F.3d 305, 306-07 (7th Cir.1996)).

[4] Alford was responsible for the following tasks: preparing transactions by searching corporate systems; gathering additional information from production underwriters; qualifying accounts according to HSB's underwriting standards and guidelines; entering information into Phoenix or QRIS; reviewing and distributing incoming mail or faxes; handling interim value adjustments;

2

Dr. Krishnan continued to treat Alford through half of 2005. During this time, Alford told Dr. Krishnan she "wanted to take a couple months off work to cope with her symptoms." R. at 186 (Dr. Krishnan's office notes). He then recommended she take a medical leave of absence and receive a second opinion. *Id.* He later stated Alford "had a loss of function" in: bending; lifting; standing; sitting; walking; fine motor skills; and cognitive skills. R. at 310 (Response from Dr. Krishnan to AIG (May 10, 2005)). Dr. Krishnan then stated Alford had been disabled from work since March 21, 2005 and should not return to work for another 8 weeks. R. at 291 (Letter from Dr. Krishnan to the Arthritis & Osteoporosis Center, Inc., (June 21, 2005)). He stated Alford suffers from severe widespread musculoskeletal pain of undetermined origin, and intermittent pain which disabled her from completing "keyboarding, writing and even performing minor calculations." *Id.* Dr. Krishnan, however, also admitted he had not seen her since May 2005 and he failed to justify his new recommendation without recently examining Alford. In May 2005, Alford went on short-term disability leave.

In July 2005, Dr. Robert Griffin Jr., a rheumatologist met Alford at the request of Dr. Krishnan and confirmed the initial diagnosis of Hashimoto's thyroiditis and fibromyalgia. R. at 213 (Letter from Dr. Griffin to Dr. Hayes (July 29, 2005) regarding Alford's examination). Dr. Griffin noted Alford's health "began to deteriorate around the time of her Hashimoto's thyroiditis diagnosis." *Id.* Alford told Dr. Griffin she experienced "fatigue, sleep disturbance, difficulty with memory and self expression, and frequent headaches." *Id.* She also informed Dr. Griffin she suffered from "memory loss and makes many mistakes at work despite taking a voluntary demotion."

---

complying with HSB Underwriting policy and standards; managing the numerous special handling requirements for certain customers or customer groups; and performing special projects as needed. R. at 233 (Hartford's job description for customer service representative). Her job requires ninety percent (90%) of her time sitting and only ten percent (10%) of her time standing or walking. R. at 224-26 (Alford's application for long-term benefits).

*Id.* Dr. Griffin recommended Alford seek a psychological evaluation for her depression, but she never did. Dr. Griffin stated he did not have adequate information to assess any potential psychiatric impairments because Alford had never undergone a psychological evaluation. R. at 176 (Alford's application for long-term disability benefits). Dr. Griffin deferred to the Functional Capacity Evaluation (FCE) as to Alford's physical and employment limitations. *Id*. Dr. Griffin also stated he could not make a recommendation as to Alford's return date to work. *Id.* Dr. Griffin did not state Alford was disabled. *Id.*

On August 30, 2005, in response to a request from AIG Disability Management, Dr. Griffin reported Alford lost function in the following areas: bending; lifting; standing; sitting; walking; fine motor skills; and cognitive skills. R. at 268-69 (Letter from Dr. Griffin to AIG (Aug. 30, 2005)). Dr. Griffin concluded she suffered from fibromyalgia and depression. R. at 275 (Dr. Griffin's office notes).

On August 31, 2005, Alford "underwent an all-night polysomnography"[5] at Saint Joseph Medical Center to confirm Alford's sleep disorder. These test results concluded Alford did not have sleep disordered breathing, but her insomnia was probably due to fibromyalgia. R. at 196 (Letter from Dr. Sajjad Shah to Dr. Griffin (Sept. 13, 2005) regarding Alford's sleep test result)). Dr. Salman Shekiah, the doctor evaluating Alford's sleep test, also recommended Alford undergo psychological evaluation. R. at 198 (Alford's Sleep Order Test Result). Alford shortly thereafter underwent a FCE at the Health South Rehabilitation Center. R. at 208 (FCE Summary Report). The tests revealed she was lifting in the sedentary category of work according to the U.S. Department of Labor Standards.[6] *Id*. Alford also "performed positional tolerance testing requiring her to bend,

---

[5] A laboratory sleep test where a 3 person spends the night in a sleep laboratory with electrodes attached to measure sleep stages and other physiologic parameters. Alford's Mot. Summ. J. 6 (citing THE MERCK MANUAL OF MEDICAL INFORMATION § 6, Chapter 64 (Home Edition 1997)).

[6] There are five terms in which strength factor is expressed: sedentary work, light work, medium work, heavy work and very heavy work. Alford's Mot. Summ. J. 6 (citing UNITED STATES

4

stand, sit, reach and engage in other positional movements." *Id.* At the conclusion of her testing, Alford stated her pain level was 9.5 out of 10. *Id.* at 211. The FCE concluded Alford could perform sedentary work.

Alford then applied for long-term disability benefits in October 2005. She submitted all of her physician's reports and testing results including the FCE and sleep tests. On November 10, 2005, Hartford denied Alford's request because she was not disabled as defined by its policy. R. at 157 (Hartford's long-term disability policy effective as of January 1, 2005). To be disabled under Hartford's policy, Alford's disability must prevent her from performing one or more of her essential duties as customer service representative for 180 days.[7] The essential duties are duties that are substantial; fundamental or inherent to the position; and cannot be reasonably omitted or changed.

---

DEPARTMENT OF LABOR DICTIONARY OF OCCUPATIONAL TITLES (4th ed. 1991)).

[7] The insurance policy provided in pertinent part the following:
> 1. This plan of Disability Insurance provides you with loss of income protection if you become disabled from a covered accidental bodily injury, sickness or pregnancy.
> . . .
> 3. Definitions
> A. Disability or Disabled (Active Employees earning less than $100,000 per year):
>> I. During the elimination period, you are prevented from performing one or more of the Essential Duties of Your Occupation
>> ii For the 24 months following the Elimination period, you are prevented from performing one or more of the Essential Duties of your occupation, and as a result your current monthly earnings are less than 80% of your indexed predisability earnings;
>> iii. After that, you are prevented from performing one or more of the essential duties of any occupation.
>> iv. To be at work for the number of hours in your regularly scheduled workweek is also an Essential Duty.
> . . .
> 4. Your disability must be the result of:
>> A. Accidental bodily injury;
>> B. Sickness;
>> C. Mental illness;
>> D. Substance abuse; or
>> E. Pregnancy.

5

As a customer service representative, Alford had to predominantly sit and "use a keyboard" and occasionally stand or walk. R. at 61 (Letter from Nancy L. D' Agostino, Hartford Examiner, to Alford (Nov. 10, 2005) denying Alford long-term benefits). The plan evaluated the occupation in the general workplace, not the applicant's specific job. Id. at 60. Hartford determined the medical reports from Dr. Krishnan, Dr. Griffin, and Alford's FCE and MRI demonstrated Alford "did not remain disabled through out and beyond the elimination period." Id. at 61. Hartford stated Dr. Griffin had not deemed her disabled and deferred to the FCE, which indicated she could perform sedentary work. Id.

Alford, shortly thereafter, appealed Hartford's denial and supplemented the record. She submitted a supplementary report from Dr. Griffin stating Alford was "unable to work at present due to dizziness, depression, pain and fatigue." R. at 153 (Dr. Griffin's supplementary report). He stated she could return to work in three to six months, but he did not comment on whether she was capable of sedentary, standing, or usual work. Id.[8] He stated he was not Alford's principal care physician, but was providing her with arthritis care only. The note, signed on December 23, 2005, stated he last treated Alford on October 27, 2005. Id.

On July 10, 2006, Hartford denied Alford's appeal based on the recommendation of Dr. Norman Bress. Dr. Bress reviewed Alford's file and supplemented evidence, and spoke with Dr. Griffin. R. at 120-23 (Letter from Laurie Tubbs, Hartford Appeal Specialist, to Alford (Jul. 10, 2006) summarizing Dr. Bress's findings). Dr. Bress did not meet or examine Alford. Dr. Bress contacted Dr. Griffin to discuss his most recent recommendation which contradicted Dr. Griffin's original opinion and the FCE to which he originally deferred. R. at 127-30 (Rheumatology Record

---

[8] This section asks what work the applicant is capable of doing. It lists Sedentary Work; Standing Work; and Usual Work. Next to each type of work, the physician has the option of checking off "Full Time" "Part Time" or "None." Dr. Griffin left this section blank and did not comment on her physical capabilities at work.

Review to Hartford from Dr. Bress)  In his letter to Dr. Griffin, Dr. Bress summarized Dr. Griffin as stating Alford had fibromyalgia but there "are no restrictions and limitations from a physical point of view, since exams have been negative except for the finding of tender points which is a subjective response of [Alford] to the examiner's palpitation" and "that any impairment in [Alford] is based on her depression rather than on any physical basis." *Id.* at 129-30.  Dr. Bress's letter also warned Dr. Griffin failure to object would lead to Hartford relying on this letter in its decision on Alford's long-term benefits. *Id.* at 130.  Dr. Griffin was asked if he would object if Alford requested a release to return to work.  R. at 140 (Hartford's instructions to Dr. Bress regarding medical review).  Dr. Griffin did not agree in writing to Dr. Bress's summary of their discussion, but did not object to it either. *Id.* at 132.  Dr. Bress reported Dr. Griffin had no objection to the Plaintiff returning to work but that depression may be a major factor. R. at 130.  Alford applied for Social Security benefits during the same time she applied for Long-Term Disability Benefits. Alford's claim for Social Security benefits was approved on November 22, 2006, after Hartford denied her appeal.

**DISCUSSION**

A motion for summary judgment will only be granted if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed R. Civ. P. 56(c).  The Court must review all of the evidence in the record and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Stephens v. Kerrigan*, 122 F.3d 171, 176-77 (3d Cir. 1997).  In considering a motion for summary judgment, a court does not resolve factual disputes or make credibility determinations and must view the facts and inferences in the light most favorable to the party opposing the motion. *Big Apple BMW, Inc. V. BMW of N.A., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992), cert. denied., 507 U.S. 912 (1993).  When considering cross motions for summary judgment, this Court must consider each motion separately, drawing inferences against each movant in turn. *Blackie v. Maine*, 75 F.3d 716,

721 (1st Cir. 1996).

In evaluating ERISA cases, courts must first determine the appropriate standard of review and then decide whether the denial was appropriate under that particular standard of review. The default standard of review for ERISA is *de novo*. *Firestone Tire & Rubber Co. v. Bruch*, 189 U.S. 101, 115 (1989). The standard of review changes to arbitrary and capricious if "the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Pinto v. Reliance Standard Life Ins. Co.*, 214 F.3d. 377, 378 (3d Cir. 2000). Under traditional arbitrary and capricious standard, "an administrator's decision will only be overturned if it is without reason, unsupported by substantial evidence or erroneous as a matter of law." *Id.* at 387.

Within the arbitrary and capricious standard of review, the courts have adopted an adjustable sliding scale that adjusts to the evidence regarding "whether the administrator appropriately exercised its discretion." *Post v. Hartford Ins. Co.*, 501 F.3d 154, 162 (3d Cir. 2007). Courts will scrutinize the evidence according to the appropriate level on the sliding scale. The standard is heightened along a sliding scale when an administrator acts under a conflict of interest. *Pinto*, 214 F.3d at 387. Along the sliding scale, the degree of scrutiny is "heightened," to match the degree of conflict, granting the "administrator deference in accordance with the level of conflict." *Id.*; *Post*, 501 F.3d at 162. "[I]f the level of conflict is slight, most of the administrator's deference remains intact, and the court applies something similar to traditional arbitrary and capricious review." *Post*, 501 F.3d at 161. In other words, the Court is deferential but not absolutely deferential. *Pinto*, 214 F.3d at 393.

To determine the level of conflict, the Court must consider the existence of both structural and procedural factors. *Post*, 501 F.3d at 162. The structural inquiry asks whether the structure of the plan raises concerns about the administrator's financial incentive to deny coverage improperly. *Id*.

at 163. Such structural factors include: "(1) the sophistication of the parties, (2) the information accessible to the beneficiary, (3) the financial arrangement between the employer and the administrator, and (4) the financial status of the administrator." *Id*. Cases have further considered the administrator's claim evaluation process as an additional factor, "according more deference to administrators that use an independent body to evaluate claims (thus lessening the effect of any conflict)." *Id*. (citing *Stratton v. E.I. DuPont De Nemours & Co.*, 363 F.3d 250, 255(3d Cir. 2004)). Structural conflicts of interest exist when an insurance company "both funds and administers benefits" and potentially when "the plan is funded on a case-by-case basis." *Post*, 501 F.3d at 163. Cases where the employer or independent insurer funds, interprets, and administers the benefits plan generally present a conflict of interest, and some form of heightened review is appropriate. *Pinto*, 214 F.3d at 383; *Smathers v. Multi-Tool, Inc./Multi-Plastics, Inc. Employee Health and Welfare Plan*, 298 F.3d 191, 197 (3d Cir. 2003).

The procedural inquiry focuses on evidence of bias in the administrator's decision-making process. *Post*, 501 F.3d at 164. Procedural irregularities raising suspicion of bias include: "(1) reversal of position without additional medical evidence; (2) self-serving selectivity in the use and interpretation of physicians' reports; (3) disregarding staff recommendations that benefits be awarded; and (4) requesting a medical examination when all of the evidence indicates disability." *Id*. at 164-65. When applicable, the Court will also consider the disagreement between the Social Security Administration and Defendant in the award of benefits. *Id.* at 167. Although such a disagreement is not dispositive, it is relevant in the Court's determination. *Id.*

Both parties agree the Court should start at a slight "heightened arbitrary and capricious" because Hartford insures and administers the plan, thus creating a conflict of interest. *Id.* at 165. Alford further asks the Court to apply a "high degree of skepticism" standard of review because of her lack of sophistication, the lack of information accessible to her, the financial arrangement between

her employer and Hartford, and Hartford's self-serving selectivity when denying Alford's request.

It is the claimant's burden to provide evidence supporting the Court's heightened standard of review. *See Kotrosits v. GATX Corp. Non-Contributory Pension Plan for Salaried Employees*, 970 F.2d 1165, 1174 (3d Cir. 1992); *Marciniak v. Prudential Fin. Ins. Co. of Am.*, 184 Fed. Appx. 266, 268 (3d Cir. 2006). Alford argues she lacked sophistication in the "labyrinth" of ERISA matters compared to Hartford, who processes these matters frequently. Alford did lack sophistication in ERISA matters, meriting only a slight increase in the standard of review. *Stratton v. E.I. DuPont De Nemours & Co.,* 363 F.3d 250, 254 (3d Cir. 2004).

Regarding access to information, the record demonstrates Hartford made "a conscientious effort . . . to keep [Alford] apprised of the information it had at its disposal and the reasons animating its decision to deny benefits." *Stratton,* 363 F.3d at 254; R. at 64 (Letter from Hartford to Alford (Aug. 17, 2005) requesting physician's statement for long-term disability benefits); 141 (Letter from Hartford Appeal Unit to Alford (May 23, 2006) informing Alford of ERISA's 45 day time limit for appeal decision); 144 (Letter from Hartford to Alford (Dec. 29, 2005) stating where supplemental evidence regarding her appeal should be sent); 152 (Letter from Alford to Hartford (Jan. 4, 2006) discussing Dr. Griffin's supplemental report); 156 (Letter from Alford to Hartford (Dec. 15, 2005) indicating her desire to appeal Hartford's denial); 168 (Letter from Hartford to Alford (Jul. 25, 2005) summarizing requirements to apply for long-term benefits). Alford argues regardless of Hartford's efforts, she was not aware of what information her physicians were submitting. Alford's letter to an insurance processor referencing Dr. Griffin's last recommendation that she "was no longer able to work" contradicts this argument. R. at 145 (Letter from Alford to Nancy L. D'Agostino (Jan. 4, 2006)). This factor does not affect the sliding scale.

As to the financial arrangement between Hartford and Alford's employer, Alford argues Hartford has an added incentive to deny the benefits because it funds the disability benefits. She

calculates she would be entitled to $370,000 based on her monthly disability income of $1945.67. R. at 118 (Alford's long-term disability benefits application). This calculation, however, fails to show the individuals processing her claim were involved in the funding or received an incentive to deny more claims. *Stratton,* 363 F.3d at 254-55. This individualized incentive is the type of conflict courts are to consider. Unfortunately for Alford, the record lacks any evidence of such an individual financial incentive. The sliding scale remains at a moderately heightened arbitrary and capricious.

Alford argues the procedural anomaly of self-serving selectivity existed when Hartford ignored the other evidence and only relied on 1) the functional capacity evaluation, ignoring the cognitive aspects of Alford's customer service position; and 2) Dr. Bress's report finding Alford not disabled, thus ignoring Dr. Krishnan and Dr. Griffin's reports; and pointedly asking the providers whether they would object if Alford requested to return to work. These arguments are unpersuasive. In this case, the moderately heightened arbitrary and capricious standard is appropriate.

Alford argues my decision in *Small v. First Reliance*, 2005 U.S. Dist. LEXIS 3153 (E.D. Pa. Feb. 28, 2005) supports a "heightened skepticism" standard of review because Hartford, similarly to First Reliance, only relied on the FCE approving sedentary work when denying Alford's claim. Alford's reliance on *Small* is misplaced because Small was a web technician and submitted evidence pertaining to her cognitive abilities.[9] Small's job required her to use "language, math, and reasoning skills." *Id.* at *18. Small was also required to stay current with new technologies and was required to update websites. *Id.* Alford, as a customer service representative, is primarily required to conduct data entry, sit, and occasionally walk and stand. She filled out her long-term disabilities application

---

[9] Even if Alford's cognitive abilities should have been assessed, Alford did not provide any supporting documentation or reports. Small, on the other hand submitted reports from her treating physicians including a neurologist. *Id.* Despite Dr. Griffin's recommendations, Alford did not seek psychiatric treatment or evaluations. Alford has also not submitted any neurological or psychiatric reports verifying her fibromyalgia and/or depression have compromised the "cognitive" aspects of her position. Hartford, consequentially, evaluated the medical information it had which only pertained to her physical limitations.

indicating 90% of her work was data entry and 10% required standing or walking. R. at 226 (Alford's application for long-term disability benefits). Based on the customer service representative description, relying on the FCE's determination she can do sedentary work it is not self-serving. Her job, unlike Small's, does not require her to "maintain the website . . ., educate other personnel . . ., or stay current with new technologies," meriting a cognitive abilities assessment. *Small*, 2005 U.S. Dist. LEXIS, at * 18.

Alford further contends self-serving selectivity existed when Dr. Bress ignored the evidence demonstrating Alford was disabled and pointedly asked whether the doctors would object if Alford wanted to go back to work. The record does not support Alford's argument. In fact, Dr. Bress reviewed the office notes of Dr. Krishnan, Dr. Krishnan's June 21, 2005 letter, Dr. Griffin's office notes, Dr. Griffin's Oct. 14, 2005 supplemental notes, the sleep study, the FCE, and the lab reports. He also spoke with Dr. Griffin on June 20, 2006, but was not able to speak with Dr. Krishnan because Dr. Krishnan had left the practice a year ago. Dr Krishnan's June 21 letter did indicate Alford was incapable of going to work, but Dr. Krishnan failed to explain his new recommendation. R. at 291 (Letter from Dr. Krishnan to the Arthritis & Osteoporosis Center, Inc., (June 21, 2005)). It is not self-serving for Dr. Bress to disregard Dr. Krishnan's recommendation because Dr. Krishnan failed to explain his reason for recommending Alford's extended disability leave and Dr. Krishnan was not Alford's current rheumatologist.

Dr. Bress did speak with Dr. Griffin about Dr. Griffin's recommendation Alford stay out of work for three to six months. Dr. Griffin indicated to Dr. Bress Alford's "depression [was] her biggest issue." R. at 131 (Letter from Dr. Bress's to Dr. Griffin (June 21, 2006) summarizing their conversation). Alford did not provide any medical documentation regarding her depression. Dr. Bress evaluated all the evidence presented and considered the lack of evidence regarding Alford's depression. Based on the reports, recommendations, the lack of evidence supporting the new

recommendations, and the lack of evidence regarding Alford's depression, it was not self-serving for Dr. Bress to recommend denying Alford's appeal.

Alford also baselessly contends asking whether Dr. Griffin would object to Alford's release to go back to work is an example of self-serving evidence because it solicits a particular answer. Dr. Griffin could have objected, but he did not. Dr. Bress summarized his conversation with Dr. Griffin indicating Alford's depression was her biggest issue and provided Dr. Griffin the opportunity to reject the summary for the record. Dr. Griffin did not respond.[10] Dr. Bress also reviewed Alford's entire file plus Dr. Griffin's new recommendation and his own conversation with Dr. Griffin regarding that new recommendation. After reviewing the record, I conclude no self-selectivity exists and the moderately heightened arbitrary and capricious standard of review should apply.

"Under the arbitrary and capricious standard, an administrator's decision will only be overturned if it is without reason, unsupported by substantial evidence or erroneous as a matter of law [and] the court is not free to substitute its own judgment for that of the defendants in determining eligibility for plan benefits." *Pinto*, 214 F.3d at 387 (holding judges assures appropriate ERISA procedure is followed). When evaluating the record, ERISA does not require "plan administrators to credit the opinions of treating physicians over other evidence relevant to the claimant's medical condition." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003). Similarly, ERISA does not "impose a heightened burden of explanation on administrators when they reject a treating physician's opinion." *Id*. at 831. An ERISA plan administrator does not abuse its discretion when it resolves conflicts in medical records and concludes that a claimant is not disabled. *See Nichols v. Verizon Communications*, 78 Fed. Appx. 209, 211 (3d Cir. 2003).

---

[10] Alford contends she is "hamstrung by an inartful physician." I and the Hartford administrators are limited to the record before us, including "inartful" physician's reports. Dr. Bress, however, did speak with Dr. Griffin. This conversation served as Dr. Griffin's opportunity to clarify or expand upon any previous alleged "inartful" reports.

13

If a case comes down to a "battle of the experts" and the standard of review is arbitrary and capricious, the employer will likely win "when it has produced sufficient evidence supporting its position. The employer cannot be said to have acted arbitrarily and summary judgment in its favor is appropriate." *Post*, 501 F.3d at 157. Under a heightened arbitrary and capricious standard, the deference accorded to the administrative decision remains mostly intact. I apply "something similar to traditional arbitrary and capricious review," and defer to the administrator's "reasonable and carefully considered conclusions." *Id.* at 164. Under the arbitrary and capricious and heightened arbitrary and capricious standard of review, a court is limited to the "evidence that was before the administrator when he made the decision being reviewed." *Mitchell v. Eastman Kodak Co.*, 113 F.3d. 433, 440 (3d Cir. 1997); *Oslowski v. Life Ins. Co. of N. Am.*, 139 F. Supp. 2d 668, 675-76 (3d Cir. 2001).

Alford asserts the record does not support Hartford's denial even under an arbitrary and capricious standard of review. *Work v. Hartford Life & Accident Insurance Company*, 247 Fed. Appx. 385, 387 (3d Cir. 2007). In *Work*, the Third Circuit reversed Hartford's denial under the arbitrary and capricious standard because Hartford's reviewing doctor conducted a "paper review" and only relied on Work's orthopedic surgeon's report Work could "use her hands and feet; . . . kneel, crouch, crawl . . ." *Id.* This same orthopedic surgeon also recommended Work remain out of work. *Id.*

Unlike Work's reviewing doctor, Dr. Bress did not just deny Alford's appeal based on one piece of evidence recommending she could do sedentary work. Dr. Bress denied her appeal after reviewing documents including Dr. Krishnan's office notes, Dr. Krishnan's June 21, 2005 letter, Dr. Griffin's office notes and recommendations, Dr. Bress's conversation with Dr. Griffin, the FCE, the sleep disorder results, and Dr. Griffin's new recommendation. Dr. Krishnan did state Alford's Hashimoto's thyroiditis and fibromyalgia "totally disabled to do any meaningful function at work

even including keyboarding, writing and even performing minor calculations." R. at 291 (Letter from Dr. Krishnan to the Arthritis & Osteoporosis Center, Inc., (June 21, 2005)). Dr. Krishnan, however, had not seen Alford for almost two months before writing this recommendation and was not Alford's primary rheumatologist at the time. Dr. Griffin also stated Alford should be out of work for three to six months, but admitted to Dr. Bress Alford's depression was a major factor. Alford did not provide any documentation regarding her depression. Dr. Griffin referred to the FCE for Alford's physical limitations and the Functional Capacity Evaluation established Alford was "capable of performing at least sedentary level work." R. at 176 (FCE results).

Regarding Dr. Griffin's change of opinion, Dr. Bress did not defer to it because Dr. Griffin had not examined Alford in the interim, R. at 159; no evidence supported Dr. Griffin's post-termination opinion, R. at 153, and Dr. Griffin failed to provide any explanation or objective medical evidence to support his change of position. Hartford also is not obligated to defer to this post-termination change of opinion. *See Black & Decker*, 538 U.S. at 825; *Sell v. Unum Life Ins. Co. of Am.*, No. 01-4851, 2002 U.S. Dist. LEXIS 22472, *18 (E.D. Pa. Nov. 20, 2002) (deciding no need to defer to letter of treating physician who "changed his opinion only after his initial view was used to discontinue [plaintiff's] benefits . . .").

Alford also asserts the Court should consider her 2006 Social Security Administration (SSA) determination of disability. This argument also fails. The Third Circuit has decided SSA can be considered in deciding whether "a plan administrator has acted arbitrarily and capriciously in reviewing a plaintiff's claim." *Marciniak*, 184 Fed. Appx. at 269 (citing *Dorsey v. Provident Life & Accident Ins. Co.*, 167 F. Supp. 2d 846, 856 n. 11 (E.D. Pa. 2001)). The SSA determination by itself, however, does not prove Hartford denied Alford's claim arbitrarily and capriciously. *Id.* Standards for disability under Hartford's plan and Social Security differ, and the SSA cannot be held against Hartford. *Id. Contra Post*, 501 F.3d at 167 (rejecting the administrator's inconsistent use of the SSA

determination to both award and reject the petitioner's disability benefits).   As previously discussed, Hartford denied Alford's application for benefits on substantial evidence.

In summary, I have reviewed Hartford's denial under a moderately heightened arbitrary and capricious standard of review.  The evidence presented to me demonstrates no structural or procedural anomaly exists other than Hartford self-administering and insuring claims and Alford's lack of sophistication in ERISA matters.  Alford provided Hartford with evidence regarding her physical limitations, but no evidence regarding her depression or other psychiatric evaluations.  Hartford's decision to deny Alford's claim, when reviewed under a slightly heightened standard, was neither arbitrary nor capricious.

An appropriate order follows.